IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM


UNITED STATES OF AMERICA,   ) Criminal Case No. 15-00029-2
                    )
          Plaintiff,  )
                    )
      vs.            )
                    )
AMBROSIO D. CONSTANTINO, JR., )
and FRANKLIN R. BABAUTA,    )
                    )
          Defendant.  )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
JANUARY 5, 2016; 10:18 A.M.
HAGATNA, GUAM


**Change of Plea Hearing**


Proceedings recorded by *mechanical stenography*, transcript produced by computer.

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIVIC DAVID, AUSA,**
**ROSETTA SAN NICOLAS, AUSA**
108 Hernan Cortez Avenue
Sirena Plaza, Suite 500
Hagatna, Guam 96910




Appearing on behalf of defendant:


**LAW OFFICE OF LUJAN & WOLFF**
**BY: DAVID J. LUJAN, ESQ.**
DNA Building, Suite 200
238 Archbishop Flores Street
Hagatna, Guam 96910


ALSO PRESENT:

Joe Strantz, FBI

---------------------------------------

I N D E X

                                              Page

Court rejects proposed plea agreement         72

**January 5, 2016; 10:18 a.m.; Hagatna, Guam**

* * *

THE CLERK:  Criminal Case No. 15-00029, *United States of America versus Franklin R. Babauta*; Change of plea.

Counsel, please state your appearances.

MS. DAVID:  Good morning, Your Honor.  Marivic David for the United States and Special Agent Joe Strands, with the FBI.

THE COURT:  Okay, good morning, Ms. David and Agent Strantz from the FBI.

AGENT STRANTZ:  Good morning.

MR. LUJAN:  Good morning, Your Honor, David Lujan, with Mr. Babauta.

THE COURT:  Okay, good morning, Mr. Lujan and Mr. Babauta.  You may be seated.

MR. LUJAN:  Thank you.

THE COURT:  Okay, first of all, couple things, I'm kind of disappointed that I'm getting this proposed plea agreement at the midnight hour and now it's costing the Court money to bring in the jurors, Counsels.  I thought I had told the U.S. Attorney's Office that if there's gonna be a plea agreement, a proposed plea agreement, that's fine, but it should be at a time when the Court doesn't have to expend the resources for all the jurors to come in, because it was going to be very difficult to call 60 jurors last night at four or

1    5:00 p.m. and make sure they not come in.  So they're all here

2    and so this is going to cost the government a lot of money.

3    This has happened before and I've already expressed this

4    before to the U.S. Attorney's Office, Ms. David, as you

5    probably know.

6                MS. DAVID:  Yes, Your Honor.  And certainly the

7    U.S. Attorney was made aware of the change, the last-minute

8    change, with respect to the parties.

9                THE COURT:  Yeah, I know, but why didn't you guys

10   call me earlier?  Why didn't you call the Court earlier, so

11   that we would have had the opportunity to get a hold of the

12   jurors, because I -- I was in the middle of the suppression

13   hearing yesterday, all day and all afternoon.

14               MS. DAVID:  Your Honor, the --

15               THE COURT:  And I didn't get the information till

16   about 3:30 or four o'clock last night.

17               MS. DAVID:  That was when the government received

18   notice from counsel that the proposal had been accepted.

19               THE COURT:  Uh-huh.

20               (Pause.)

21               (Discussion with law clerk and the Court.)

22               THE COURT:  Okay.  All right.

23               (Pause.)

24               THE COURT:  Okay.  Yes, Ms. David?

25               MS. DAVID:  Your Honor, Counsel, I'm sure, as

1  well, informed the Court at the earliest opportunity.  And

2  certainly the government could only have informed the Court

3  once it received confirmation of acceptance.  And it was -- I

4  recall that my office did do that at the earliest -- as soon

5  as we received confirmation from counsel.

6          THE COURT:  But all I'm saying is that even if

7  you're contemplating a plea agreement, I mean, you guys

8  already had submitted the exhibit list, we were getting all

9  the jurors to come in and so forth, and there's a movement.  I

10  guess, now, I'm just hearing from my staff that Merle has

11  tried to get a hold of the jurors to not come in, to call in

12  till one.  So that's gonna be helpful.  But in the meantime,

13  you guys have been told not to the do this at the last minute

14  because it does cost the government money when the jurors do

15  come in.

16          MS. DAVID:  Yes, Your Honor.  We -- I certainly

17  will be mindful of that going forward, Your Honor.

18          THE COURT:  Okay.

19          MR. LUJAN:  Your Honor, if I may add, Your Honor.

20  In fairness to Ms. David, we were talking to each other in,

21  you know, the afternoon, but the decision to accept the deal,

22  you know, by my client was not made until 3:30.  And the

23  minute, you know, we decided that we were going to go with the

24  deal, I immediately called Ms. David.  I told her.  And then

25  I -- you know, we agreed that I should call the Court and I

1    immediately called the Court.  I called, you know, I -- Ms.

2    David gave me two numbers, one for Carmen and one for Marlyn.

3    I was not able to get a hold of Carmen, I was able to get a

4    hold of Marilyn.  So Marilyn and I spoke.  And then -- you

5    know, then I told her everything and please to try and, you

6    know, call the jurors to stop them because the deal, you know,

7    has been --

8              THE COURT:  Well, we can't stop the jurors until

9    and until the defendant -- first of all, the Court has to

10   accept the plea agreement.  Secondly, if the Court accepts it,

11   then the defendant has to go through the colloquy.

12             MR. LUJAN:  Yes.

13             THE COURT:  And then the Court has to see if he

14   gets through the colloquy.  So the jurors still have to be

15   called in.

16             MR. LUJAN:  Okay.  But -- but, you know, Your

17   Honor, that part -- you know, of course I'm not --

18             THE COURT:  You know that.

19             MR. LUJAN:  Yeah.  But, you know, I tried -- you

20   know, I tried to assist in every way but, you know, as Ms.

21   David said, it was not until around 3:30 that, you know, we

22   decided to take the deal.  And so -- what do you call?  Then

23   of course, I was told by the Court that I need to, you know --

24             THE COURT:  Submit the plea agreement.

25             MR. LUJAN:  -- submit the plea agreement and we

1  did that.  And, you know --

2          THE COURT:  Yeah, what time did you receive that

3  yesterday?  About 4:30?

4          MR. LUJAN:  Probably, Your Honor, because, you

5  know, I had to go through it with my client and everything and

6  get him to sign and send it to the U.S. --

7          THE COURT:  I'm just saying, from the point of

8  view from the Court in terms of administration, of course any

9  defendant can plead guilty, that's not the issue.  The issue

10 is the timing of it and calling in the jurors and getting --

11 sending out all the summons.  It costs money to send out all

12 the summons, getting them to call in, having them come in and

13 so forth.  So that's my issue.  And these jurors have to be

14 here anyway unless and until the Court is confident that the

15 plea agreement has been -- has gone through.

16         MR. LUJAN:  Okay.

17         THE COURT:  So I'm saying that to both of you.

18 In the future -- again, this is the second time this has

19 happened.  In the future, it would have been nice if I had

20 even been told yesterday morning that there's a possibility

21 that there's going to be a plea agreement, and even last week.

22 I mean, you guys had already filed your paperwork.  I didn't

23 know that you guys were thinking about a plea.  You guys had

24 indicated you were ready to go to trial.  So I'm quite

25 concerned about this issue, again, of reappearing here in

1  court.

2          So anyway, that's enough of that.  Let's move on.

3  All right.

4          Let me just talk about this proposed plea

5  agreement, which I do have a concern about because -- let me

6  just ask the parties.

7          We went from the defendants -- the defendant,

8  Mr. Babauta, has been charged with theft and aggravated

9  identity theft, right?

10          MR. LUJAN:  That's correct, Your Honor.

11          THE COURT:  Okay.  And the prosecutor and defense

12  counsel have submitted -- well, initially, they wanted him,

13  Mr. Babauta, to go through a diversion program -- a diversion

14  agreement, and the Court has rejected that.  And now the

15  parties have come in and asked that the defendant plead to

16  conversion of government property as a misdemeanor.  Is that

17  correct?

18          MR. LUJAN:  That's correct, Your Honor.

19          THE COURT:  All right.  So let me look at

20  something here.  All right.  So this is essentially a

21  situation where the -- in this plea agreement, that the

22  prosecutor has offered to the defense, and defense and

23  prosecutor would like the Court to accept, is an agreement

24  where the prosecutor will move to dismiss the two charges that

25  he's been indicted for and have the defendant -- the two

1    felony charges that the defendant has been indicted for, and

2    now the defendant will plead guilty to a misdemeanor; correct,

3    Ms. David?

4                   MS. DAVID:  Yes, Your Honor, that's correct.

5                   THE COURT:  All right.  Right.  And so, under --

6    and I'm looking at 11(c) ; Plea agreement procedure, so that

7    falls under 11(c)(1)(A) because that's what you just

8    indicated.  So the Court can accept or reject the plea

9    agreement.

10                  And the concern I have in this particular plea

11   agreement is what is the difference between this case and the

12   case that Mr. Gorman had previously come before the Court?

13   The defendant -- let me just get her file here.  And I brought

14   this up before.  Because I see no difference.  Charlene

15   Apatang-Blas.  I got it.

16                  Charlene Apatang-Blas who was prosecuted or has

17   been indicted with the same identical offenses.  And she was

18   -- her plea agreement was that she would have to enter a plea

19   to a felony misdemeanor, and she was not offered diversion.

20   So I see a disparity in treatment and I'm concerned about

21   that.  So I'm questioning whether or not this is fair to --

22   fair in terms of procedures here in the District Court.

23                  Ms. David?

24                  MS. DAVID:  If I may, Your Honor.

25                  THE COURT:  And you were the prosecutor in both

1    cases.

2                Yes, Ms. David?

3                MS. DAVID:  Your Honor, with respect to this

4    defendant, Mr. Babauta, unlike the case of Ms. Blas that the

5    Court referred to, where, in her case, Defendant Blas had been

6    a recruiter assistant who obtained another person's personal

7    identification information by means of fraud without --

8    without that individual's consent, and was able to receive a

9    recruiting bonus under the Guard Recruiting Assistance

10   Program.

11               THE COURT:  And what was her rank?  And this is

12   in the National Guard, right?

13               MS. DAVID:  That's correct, Your Honor.  I think

14   she was a sergeant.

15               THE COURT:  Okay.

16               MS. DAVID:  With respect to Mr. Babauta, Your

17   Honor, he -- the facts of this case show that he was not a

18   recruiting assistant, although he did try to become one, but

19   was unsuccessful.

20               THE COURT:  But he tried to get on to the

21   computers to -- so he did that wrongfully.

22               MS. DAVID:  He was ineligible, Your Honor,

23   because he -- under the program, if you are on active duty

24   status, you're not eligible to become a recruiting assistant.

25               THE COURT:  So he wasn't -- and did he have

knowledge that he was not eligible to get on to the computer

and try to be --

MS. DAVID:  He was made aware that he couldn't

participate in that program.

THE COURT:  Before or after he tried to get on to

the computer?

MS. DAVID:  Um, um, when he tried to get on, the

computer, he was unsuccessful.

THE COURT:  So that's when he found out that he

was not eligible?

MS. DAVID:  That is correct, Your Honor.

THE COURT:  Okay.  So then -- go ahead.

MS. DAVID:  And in this case, unlike the case of

Ms. Blas, the soldier whose information was used to obtain the

recruiting bonus, was a family member --

THE COURT:  Was his son.

MS. DAVID:  Yes, correct, Your Honor.

THE COURT:  Right.  So the nominee -- you call

him a nominee, right?

MS. DAVID:  That's correct.  So the potential

soldier, or the nominee, had provided consent for use of the

personal information.  I mean, it's the defendant's son.

THE COURT:  So doesn't that make it even a little

more aggravated?

MS. DAVID:  No, Your Honor.  Given the facts that

1   later came to light that William, the son, had, according to

2   the government's evidence in this case, provided consent to

3   use his name, his date of birth, his social security number,

4   for his dad's use.

5               THE COURT:  But his dad is not eligible, so it

6   doesn't matter.  His dad is not eligible to be a recruiting

7   assistant.

8               MS. DAVID:  Right.  That --

9               THE COURT:  So that consent is -- it means

10  nothing.

11              MS. DAVID:  That became known indeed to the

12  parties later on that --

13              THE COURT:  Okay.

14              MS. DAVID:  That there was a consent made, unlike

15  --

16              THE COURT:  Which means nothing.

17              MS. DAVID:  Right.  Well --

18              THE COURT:  Because he's not eligible anyway.

19              MS. DAVID:  Correct, Your Honor.

20              THE COURT:  His father cannot recruit him,

21  essentially, because he was an active duty -- he was in active

22  status.

23              MS. DAVID:  That is correct, Your Honor.  So

24  here's an individual known to the defendant unlike the case of

25  Ms. Blas, a soldier who had never met the defendant, had never

1   provided consent for use of that soldier's personal

2   identification information.  That's not the case here.

3              THE COURT:  Was the -- Charlene Apatang-Blas, was

4   she given that information from someone else?  Did somebody

5   approach her or did she approach somebody else according to --

6              MS. DAVID:  She didn't approach anyone in

7   obtaining that information.

8              THE COURT:  Okay, hold on a second.  Let me look

9   at her plea agreement.  She approached no one?  Here we go.

10             MS. DAVID:  That's what I recall, Your Honor.

11             THE COURT:  I thought a recruiter agreed to

12  provide her with the personal identifier of the soldier,

13  according to the factual basis.

14             MS. DAVID:  I think -- I thought the question

15  that the Court raised was:  Did Ms. Apatang-Blas approach the

16  potential soldier who she nominated?

17             THE COURT:  So she -- okay.  That's right.  So

18  she didn't approach the soldier but somebody -- a recruiter at

19  the National Guard or somebody approached her and gave her the

20  personal identifying information?

21             MS. DAVID:  I don't recall that to be the case,

22  Your Honor.

23             THE COURT:  Well, you want to look at the plea

24  agreement?  Here, look at the plea agreement.

25             MS. DAVID:  May I approach, Your Honor?

1          THE COURT:  Yeah.  I'm just looking at it here.

2     And should that make a difference, it's on page 5 and 6 of the

3     plea agreement.  Bottom of five and -- so there was a

4     recruiter, as I see it, according to the factual basis, that

5     -- you could see that too, Mr. Lujan, if you'd like.

6          MS. DAVID:  Oh, I've had a chance to look at the

7     portion that the Court referred to.  And I stand corrected.

8     The recruiter did provide Ms. Blas the personal identifier of

9     the soldier, and I think -- I recall Ms. Blas, in her hearing,

10    informing the parties, including the Court, that this is

11    someone -- I think this had been, like, a high school friend

12    whom she knew back then.  This --

13         THE COURT:  When you say "this," you mean the

14    nominee or the recruiter?

15         MS. DAVID:  No, the recruiter.

16         THE COURT:  Okay.

17         MS. DAVID:  Pardon me, the nominee who she

18    falsely claimed to have recruited, she identified as being a

19    former high school friend who did not provide the defendant

20    with approval or consent to use the personal identifiers.

21         THE COURT:  So she did know him?  The nominee was

22    known to Ms. Blas?

23         MS. DAVID:  Right.  But the nominee did not

24    provide consent.

25         THE COURT:  Okay.

1          MS. DAVID:  And --

2          THE COURT:  So similar to Mr. Babauta's case,

3   like he knows his son, obviously, and he knows -- he would

4   have info and personal identifying information, the nominee in

5   this case also knew Ms. Blas?

6          MS. DAVID:  Um, as a former high school friend.

7   I think that's what the record will show in an earlier

8   proceeding, Your Honor.

9          THE COURT:  Okay.

10         MS. DAVID:  However, and I thank the Court for --

11         THE COURT:  Can I have my case back.  Thank you.

12  I'm just going through it because I want to be sure that we're

13  being fair.

14         MS. DAVID:  Yes, Your Honor.

15         THE COURT:  And I don't -- you're going to have

16  to explain this to me because I don't feel like you're being

17  fair.  And correct me if I'm wrong, because I want to go

18  through this.

19         MS. DAVID:  In Mr. Babauta's case, unlike Ms.

20  Blas's case, the Court did indicate that Ms. Blas's, as well,

21  obtained the personal information from the recruiter, that's

22  not the case here for Mr. Babauta.  He actually knew already

23  the personal information of his son.

24         So Your Honor --

25         THE COURT:  And what is Defendant Babauta's rank?

1          MS. DAVID:  Your Honor, he --

2          THE COURT:  And does that make a difference?

3          MS. DAVID:  At the time of this offense, he was a

4    lieutenant colonel.

5          THE COURT:  Okay.

6          MS. DAVID:  That's certainly one factor the

7    parties did -- the government did consider, but we also had to

8    weigh other factors including, for example, he -- he had the

9    consent of the potential soldier to use the personal

10   identification information.

11         THE COURT:  Yeah, but I mean -- but according to

12   the G-RAP program, it's not the consent that's critical, it's

13   that the recruiter has to actually meet with the nominee and

14   get that information from the nominee, personally.

15         MS. DAVID:  Your Honor is absolutely correct.

16   And one of the mitigating factors in Mr. Babauta's case is

17   that he was not the recruiter.

18         THE COURT:  But he conspired with somebody else

19   to recruit his son, Constantino.  Is that fair to say?

20         MS. DAVID:  It was the co-defendant who was the

21   recruiter in this case, Your Honor.

22         THE COURT:  But isn't it Mr. Babauta who

23   conspired with Constantino, his fellow National Guard --

24         MS. DAVID:  He certainly -- he certainly provided

25   the personal information --

1        THE COURT:  Did they conspire or not?  Did they

2   make an agreement?

3        MS. DAVID:  He's not -- the defendants are not

4   charged with conspiracy in this case, but there was certainly

5   --

6        THE COURT:  Okay.  So they're not charged with

7   it.  Okay, so even if they're not charged with it, did they

8   have a meeting of the minds?

9        MS. DAVID:  Yes, Your Honor, they worked

10  together.

11       THE COURT:  Okay.  He could have been charged --

12  they could have been charged with conspiracy, could they not?

13       MS. DAVID:  They could have been, yes, Your

14  Honor.

15       THE COURT:  Okay.  And so you decided not to.

16  Okay.  That's your discretion.  But so, Mr. Babauta found out

17  that he couldn't be a recruiter so he couldn't recruit his own

18  son.  So then, what did he do?  He -- according to your

19  factual basis here, under this plea agreement -- proposed plea

20  agreement you submitted yesterday, Ms. David and Mr. Lujan, it

21  says, Babauta persuaded a recruiter assistant to nominate his

22  son.  So he knew that he couldn't be a recruiter.  So then he

23  took this information and he persuaded somebody else to do it,

24  right?  That's what you say here on page 5 of the factual

25  basis?

1          MS. DAVID:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. DAVID:  That's what happened.

4          THE COURT:  So does that make it a little --

5     doesn't that make it more aggravating?

6          MS. DAVID:  Your Honor, I don't believe so.  I'm

7     focusing on the fact with respect to Mr. Babauta that... he

8     wasn't the recruiter assistant.

9          THE COURT:  Okay.

10         MS. DAVID:  He received information from other

11    sources, including some recruiters that -- that ended up being

12    wrong.  Advice that ended up being wrong, to his peril.

13         THE COURT:  For example?  What are you talking

14    about?

15         MS. DAVID:  For example, he -- he would -- he

16    received information from other recruiters that he can, for

17    example, G-RAP his son.

18         THE COURT:  Okay.  So now he finds out he's not

19    eligible.  Okay.  So then -- okay.  So that's one thing.  So

20    then he moves over to ask Constantino, who is eligible?

21         MS. DAVID:  Yes, Your Honor.

22         THE COURT:  Constantino, now we know him, and

23    what is his rank?

24         MS. DAVID:  Your Honor, I believe he was a major.

25         THE COURT:  Okay.

1          MS. DAVID:  With the Guard.

2          THE COURT:  Okay.  So does that factor taken in

3  -- you took that factor into consideration when you all

4  offered him a diversion, which by the way I'm reconsidering?

5          MS. DAVID:  That's certainly a factor that was

6  considered as well, as well as other -- as well as other

7  factors, Your Honor.

8          THE COURT:  I know, but -- okay.  But with regard

9  to these factors, why should somebody who has a lieutenant

10  colonel or major rank get the benefit of a misdemeanor or a

11  diversion plea, and a sergeant, who really -- in this Court's

12  eyes at this point, just looking at the facts and the equity

13  that you're presenting to me, why wouldn't she be able to have

14  that benefit?

15          MS. DAVID:  Your Honor --

16          THE COURT:  And I'm just saying in terms of the

17  rank, let's just focus on the ranking, why would it make it

18  more mitigating for somebody with a higher rank to get a

19  better deal?

20          MS. DAVID:  Your Honor, the rank wasn't the

21  conclusive factor in both cases.

22          THE COURT:  Okay, that's what you said.

23          MS. DAVID:  We looked at, for example, whether or

24  not an individual's personal identification information had

25  been stolen and had been used unlawfully, which --

1          THE COURT:  In both instances they had.

2          MS. DAVID:  Which -- and -- and arguably, we're

3    -- and I'm sure Mr. Lujan will or may -- may -- may say so, I

4    mean, that would still be a matter of proof with respect to

5    this case, with Ms. --

6          THE COURT:  But with regard to the rank, why is

7    the rank -- you said that's a factor.  What is the deal with

8    the ranking?  Again, why would somebody who has a higher rank

9    have a better benefit?

10          MS. DAVID:  Well, Your Honor, with respect to

11   Mr. Babauta's case --

12          THE COURT:  Yeah.

13          MS. DAVID:  -- the --

14          THE COURT:  Mr. Babauta.

15          MS. DAVID:  The evidence has shown that he -- he

16   was blocked, for example, from completing the training modules

17   for the Guard Recruiting Assistance Program.  He was earlier

18   found to be ineligible.

19          THE COURT:  Right, you said that.  Okay.

20          MS. DAVID:  He received information from other

21   recruiters that it's possible that his son could receive a

22   bonus.  He then --

23          THE COURT:  But what does that got to with his

24   rank?  I'm sorry.  I'm just talking about the rank issue.  You

25   said that was a factor.  What is the importance of the --

1          MS. DAVID:  It's -- I'm not saying it was a

2    factor that weighed heavily in the decision.  I mean, we're

3    looking at the defendant's actions in this case, whether or

4    not he had knowledge as to the G-RAP program.  The evidence in

5    this case will show that although he thought he could -- he

6    himself could be a recruiter assistant, he was blocked from

7    the training manuals earlier on.

8          THE COURT:  Okay.  We got that.  You keep saying

9    that.  Okay.  I got that.  So then -- so did he figure out,

10   Okay, so now I need to get somebody to recruit him -- to my

11   son.  Okay.  That's good.  So he went over to Constantino,

12   Major Constantino, and provided this information to him.  But

13   I would assume that lieutenant Lieutenant Colonel Babauta,

14   Defendant Babauta, had figured out how to do this if he's not

15   eligible, he figured out that it would have to be Constantino

16   that would have to get the personal identifying information.

17         MS. DAVID:  Correct, Your Honor, because he was

18   the recruiter assistant.

19         THE COURT:  Right.  So he didn't know that

20   either?  He felt -- are you saying that major or Lieutenant

21   Colonel Babauta felt that he could just take the information

22   about his son and just give it to another recruiter?  That's

23   what you're saying?

24         MS. DAVID:  Um, Yes, Your Honor.  And it would be

25   up to the recruiter assistant to -- to comply with the

1    program, the Guard program.  I mean, the parties had to weigh

2    its litigative risk in this case, whether or not, for example,

3    we would -- the government would be able to prove with respect

4    to this defendant's full knowledge of the G-RAP program,

5    especially after he had heard from recruiters that it was okay

6    to do so.  We also looked into the --

7                THE COURT:  But then he also received money for

8    it.  He got some money from the recruitment.

9                MS. DAVID:  Yes, Your Honor.

10               THE COURT:  Why is he getting paid off to do it?

11   A finder's fee; is that what that is?

12               MS. DAVID:  No, Your Honor.  I think the -- the

13   plan was, as -- as -- as other recruiters had told him, that

14   it's possible under this program, for example, you can assist

15   your son with his college expenses.  He thought that it was --

16               THE COURT:  I'm sorry, can you repeat that, who

17   was told what?

18               MS. DAVID:  The facts of this case will show that

19   he received information from recruiters that --

20               THE COURT:  Mr. Babauta.

21               MS. DAVID:  That it was possible to use this

22   program to get financial assistance for his son.  He -- he --

23   he -- he -- he himself tried to be an RA, a recruiter

24   assistant, and participate in the program but before

25   completing all the training modules he found out earlier on

that he was not eligible.  So -- so the question being whether
or not he was fully aware of the -- of the program itself.  So
he then obtained the assistance of Mr. Constantino and the
exchange of the personal identification information occurred.

So the question could be raised whether or not
this defendant was fully aware of the dos and don'ts of the
G-RAP program, because he was found to be ineligible earlier
on.  Other recruiters had told him that it was possible to do
so and he relied on that information.

THE COURT:  I'm sorry, so you're saying then that
Mr. Babauta relied on these other recruiters wrongfully?
First of all, he found out he's not eligible.  So that was a
-- one wrong information.  The second one was -- then he gave
the recruiter the personal identifying information, which he
probably shouldn't have done.  Is that right?

MS. DAVID:  The recruiter assistant --

THE COURT:  Mr. Constantino, the co-defendant.

MS. DAVID:  Yes.

THE COURT:  Right, Mr. Babauta gave him that?

MS. DAVID:  That's correct, Your Honor.

THE COURT:  Okay.  And he was told do that by
some other recruiter?

MS. DAVID:  Yes, Your Honor, by some other
recruiter.

THE COURT:  Some other recruiter said, Oh, it's

okay to give to Constantino?

        MS. DAVID:  Or Try to get -- Try to nominate your son.  So -- so -- two different costs for college.

        THE COURT:  And then what about -- what about the $200 that he took, right?  Didn't Mr. Constantino get -- I'm sorry, strike that.

        Not $200.  Mr. Babauta got $1,800.  $1,800.

        MS. DAVID:  That's correct, Your Honor.

        THE COURT:  Out of the $2,000 fee that a recruiting assistant is allowed to get, every recruiting assistant.  So your -- Mr. Babauta got $1,800 and Constantino, the actual recruiting assistance, got $200?

        MS. DAVID:  That's correct, Your Honor.

        THE COURT:  So how does that -- what happened?  Somebody else told him he could do that, they could split the money and that was okay?

        MS. DAVID:  Your Honor, I think the -- the -- the facts will show that the plan from the very beginning was to see whether or not the son, the defendant's son, could -- could -- could obtain funding to defray college expenses.

        THE COURT:  I think that's great if they can do that, but that's not the issue.  I mean, obviously most parents would want their kids to go, and some parents would want their kids to go in the military and get the ability to have their college expenses paid, but what does that got to do

1    with the fee, the $2,000 fee?

2         Why is Babauta -- if Mr. Babauta is not the

3    recruiting assistant, why is he benefitting from this?  Why is

4    he personally getting $1,800?

5         MS. DAVID:  Um...

6         THE COURT:  Constantino, who's the real -- who is

7    the eligible recruiting assistant, he only got 200?

8         MS. DAVID:  Um, Your Honor, I -- that's just what

9    the facts in this case have shown.

10        THE COURT:  Is that not -- isn't that

11   aggravating?  I mean, I'm just doing a comparison between last

12   week and this week and then even just within this own -- this

13   case by itself.

14        MS. DAVID:  We're looking at the issue whether or

15   not this defendant fully was made aware of the G-RAP program,

16   unlike recruiters, unlike recruiting assistants who knew or

17   who knows the technicalities of the program.

18        THE COURT:  So you're saying Mr. Babauta, who's

19   been in the National Guard how long?  At this time?

20        MS. DAVID:  I'd say decades, Your Honor.

21        THE COURT:  Decades.  Okay.  So at least

22   20 years?  You mean to tell me that he's just ignorant of the

23   whole G-RAP program?

24        MS. DAVID:  Um --

25        THE COURT:  That's what you're saying to the

1    Court.

2              MS. DAVID:  There's technicalities under that

3    G-RAP program.  There are training modules.  There are

4    certainly responsibilities involved in the program.

5    Mr. Babauta did try to enroll, but was blocked earlier on.

6              THE COURT:  So don't you think he would have --

7    he's got -- looks like he's got a good career, he's a good

8    person, he's been in the National Guard, doesn't seem to have

9    any prior history.  I don't see any prior criminal history.

10   It would seem that he would do everything he can to make sure

11   that his son was properly recruited.  And that's not the case.

12             You're saying some other recruiter just said, Go

13   ahead, talk to someone else, give the information.  And then

14   we see this other issue of the monies, which I don't -- you

15   haven't explained that, how -- did somebody else tell him he

16   could take the money?  This recruiter -- Fernandez is a

17   recruiter, according to the trial brief, and so forth.

18   SFC Fernandez.  What does SFC mean, sergeant first class?

19             AGENT STRANTZ:  Sergeant first class.

20             MS. DAVID:  That's correct, Your Honor, sergeant

21   first class.

22             THE COURT:  So SFC Fernandez, is he the one that

23   suggested they split money like this?

24             MS. DAVID:  No, that's not what the facts are.  I

25   think the defendant received -- received advice from

1  recruiters that it was possible to G-RAP his son.

2                THE COURT:  Okay.

3                MS. DAVID:  He did try to --

4                THE COURT:  But to also receive money?  You

5  already said that.  And obviously he's not eligible because

6  he's active duty.  But what about this money?  Somebody else

7  tell him that?  I'm not clear on that.

8                Did other recruiters, other than Fernandez, SFC

9  Fernandez, say, Hey, you can split the money even though

10 you're not --

11               MS. DAVID:  I don't believe anyone else received

12 the bonus other than the co-defendants in this case.

13               THE COURT:  Mm-hmm.

14               MS. DAVID:  What -- what Mr. Constantino -- what

15 the recruiter assistant wanted to do with the money was -- was

16 up to him.

17               THE COURT:  What Constantino wanted to do with

18 the money; is that what you're talking about?

19               MS. DAVID:  Correct, Your Honor.  Because he was

20 the RA.  Not this defendant.

21               THE COURT:  Okay.  Right.  So you're saying that

22 Constantino decided, I'm going to give this to Mr. Babauta?

23               MS. DAVID:  Yes, Your Honor.

24               THE COURT:  That's your theory?

25               MS. DAVID:  That's what the facts have shown in

1   this case.

2               THE COURT:  I mean, are there guidelines that say

3   that these monies can only go to certain people and not

4   others?

5               MS. DAVID:  Um, I don't think the RA was

6   prohibited in this case from distributing the money to the

7   defendant.

8               THE COURT:  Okay.  But does it seem a little

9   fishy?  Just seems fishy that you keep -- I mean, you're

10  trying to -- and I'm honestly looking at this issue.  You

11  know, Mr. Gorman was here last week when Charlene Apatang-Blas

12  came before the Court and you were here too, Ms. David.

13              MS. DAVID:  Yes, Your Honor.

14              THE COURT:  And he was quite upset.  Like, why

15  couldn't his client get a similar offer?  And wouldn't there

16  be a disparity in treatment, a disparity in sentencing as

17  well.  And I don't think I disagree with him.

18              MS. DAVID:  Your Honor, this case presents

19  different facts.

20              THE COURT:  Seems almost more aggravating though.

21              MS. DAVID:  And I respectfully beg to differ.

22              THE COURT:  Okay.

23              MS. DAVID:  The aggravating portion of it would

24  have been if a nominee was unaware of his or her use of

25  personal information, which was indeed the case with Ms. Blas.

1          THE COURT:  Well, according to the earlier -- and

2     correct me if I'm wrong.  I thought that the nominee indicated

3     earlier on that he had never met with Mr. Constantino.  And

4     then later changed his story and said, Oh, yeah, I did meet

5     with him.  So isn't all that --

6          MS. DAVID:  That was certainly a factor that the

7     government had to consider as well in terms of its proof.  We

8     didn't have that, for example, in Mr. Blas's case where there

9     were different -- differing accounts of someone's unlawful use

10    of personal information.

11         THE COURT:  But wasn't the information unlawfully

12    used by the way it was presented and handled under this

13    aggravated identity theft charge that you prosecuted?

14         MS. DAVID:  But the question remains whether or

15    not the government's proof arguably would be able to meet that

16    with respect to this defendant who, there's evidence that can

17    be shown, was not aware of the technicality of the G-RAP

18    program.

19         THE COURT:  Well, no -- okay.  So on the

20    aggravated identity theft, I can possibly see that.  What

21    about the theft?  What about the theft charge?

22         MS. DAVID:  And I think the -- my point can still

23    be made with respect to that count whether or not this

24    defendant, who was not a recruiting assistant, who was blocked

25    from the training modules early on --

1          THE COURT:  What did he steal then?  You're

2    making it sound like he got it legally, that Constantino could

3    have given it to anyone and if he wants to give it to Babauta,

4    then Babauta is it.

5          MS. DAVID:  That's certainly an argument that can

6    be raised.

7          THE COURT:  Well, I mean, that's what you're

8    saying, you're coming into the Court and saying, Look --

9    you're going down the line -- and again, I'm just saying this

10   based on the fact that we had Sergeant Blas come in last week

11   and -- you know, we're looking at the factual basis.  And I'm

12   trying to be fair to all the defendants, including Constantino

13   that's gonna come before the Court.

14         MS. DAVID:  Yes, Your Honor.  Well, Your Honor,

15   the government has to look at this case in terms of its

16   litigative risk as to this defendant.  Whether or not we can

17   prove beyond a reasonable doubt that he was fully aware of the

18   G-RAP program because, for example, he was not the RA who was

19   trained, he is not -- he received information from recruiters

20   themselves.  It's possible to go ahead and try to -- try to

21   see if you can get a bonus under this program.  He tried.  Was

22   ineligible.  So the question is --

23         THE COURT:  No, you've already said that.

24         MS. DAVID:  And that's certainly --

25         THE COURT:  So why does he get a misdemeanor deal

1 in taking $1,800?  And you think that -- obviously, you think

2 that he stole the money because he's going -- theft of

3 property includes theft or conversion of the money, as you

4 know.

5         MS. DAVID:  Yes, Your Honor.

6         THE COURT:  In terms of the elements.  And so

7 what is the difference between, again, him and

8 Ms. Apatang-Blas who had $2,000?  Now, we're only talking

9 about $200 difference.

10         I can see, like, in a diversion deal, if you had

11 somebody who had possibly -- I mean, I'm just speculating --

12 not speculating, but hypothesizing that if somebody had a

13 first offense and it was a $200 purse that they stole from the

14 Navy Exchange or something, or the commissary, they stole some

15 groceries and so forth, the Court could consider that, you

16 know what, that should probably be a diversion case, not

17 somebody that should get a misdemeanor or felony -- well, it

18 wouldn't be a felony because it's too low, but a misdemeanor

19 diversion, I could see that, or even -- well, misdemeanor

20 diversion, even as opposed to misdemeanor felony conviction --

21 but why wouldn't she be offered that same thing?

22         MS. DAVID:  Um, Your Honor, I was just looking at

23 the facts of this case as it relates to this defendant whether

24 or not weighing all the -- whether there's mitigating

25 circumstances, whether there are problems of proof as to the

1  ability of the government to prove beyond a reasonable doubt

2  someone's knowledge and intent to commit a crime.  We had to

3  weigh and deal with the evidence that's presented before us

4  where there are different versions of events.

5          So with that in mind, the government felt with

6  respect to this defendant, because he was not a recruiter, he

7  was not a recruiter assistant, he received feedback from

8  recruiters themselves that it was possible to do this, we had

9  to factor that information in our decision to eventually offer

10  this deal.

11          THE COURT:  And so between Constantino and

12  Mr. Babauta, who's more culpable?

13          MS. DAVID:  Um, with focusing on --

14          THE COURT:  Who is a recruiter, he is a

15  recruiting assistant.  Why would you give him a diversion?  If

16  you're saying that about Constantino, and you're saying that

17  about Ms. Blas, who -- I'm sure you look at all the

18  defendants, you can't just say I look at one case by itself,

19  because you're obviously thinking about -- okay, you guys are

20  starting to launch into diversions, but who's more culpable?

21          MS. DAVID:  Your Honor has -- Your Honor's

22  questions are very valid because --

23          THE COURT:  Thank you.

24          MS. DAVID:  We certainly considered those

25  questions as well.

1          THE COURT:  Okay.  So what's the answer to that

2     question?  Who's more culpable between Mr. Babauta, who you

3     say, Look, he was given bogus information from all these

4     recruiters, so he relied on it, et cetera, et cetera.  You've

5     gone through that several times.  Okay, I get that.  But who's

6     more culpable between him and Constantino?

7          MS. DAVID:  I would say it would be the RA.

8          THE COURT:  That would be Mr. Constantino.

9          MS. DAVID:  And Your Honor has -- our office

10    indeed has -- has reservations now about the diversion

11    agreement that's currently before the Court.  And we

12    understand that there's a status hearing scheduled this week

13    with respect to that co-defendant.  It's a valid question, a

14    question I myself raised.  And I believe they are at least

15    equally culpable.

16          THE COURT:  Who's equally culpable?  When you say

17    "they," who's "they"?

18          MS. DAVID:  The defendants charged in this case.

19          THE COURT:  Oh, I thought you just said

20    Constantino was more culpable.

21          MS. DAVID:  I'm saying at least they are equally

22    culpable, but -- but --

23          THE COURT:  Okay.  I'm sorry --

24          MS. DAVID:  For purposes of the G-RAP program, it

25    would be the recruiting assistant who -- who under -- who had

1   to have gone through all the training modules before

2   acceptance under the program could be completed.

3           THE COURT:  So -- okay.  So let's focus off of

4   Mr. Babauta.  Okay, I've got it.  Your theory is that

5   Mr. Babauta has been duped by all the other recruiters.  I got

6   that.  Now, with regard to Ms. Charlene Apatang-Blas and

7   Constantino, are they equally culpable?  And he got $200.

8           MS. DAVID:  I would --

9           THE COURT:  He received 200 and he gave away

10  1,800.  You said that's perfectly fine for him to do that, as

11  I hear it.

12          MS. DAVID:  I don't know that they're equally --

13  I mean, of course, each case is going to have its own

14  different facts.  And I don't know that there is a right

15  answer that's going to be -- that's going to fit for every

16  case because it's going to be -- the answer is going to be

17  dependant on the facts of each case.

18          THE COURT:  Right, I agree.

19          MS. DAVID:  And Your Honor has asked the question

20  about comparing these two RAs in this case, as well as.

21  Ms. Blas's case.

22          THE COURT:  Well, I bring that up because John

23  Gorman, the federal public defender, was here in Court and he

24  was going a little crazy about why wasn't his client receiving

25  the same treatment as Mr. Constantino at the time.

1          MS. DAVID:  Part of the G-RAP program, Your

2     Honor, we also focus on who's nominated, the potential soldier

3     that has been nominated, whether or not consent, for example,

4     has been given by that potential nominee of his or her use of,

5     like, the name, the date of birth, the social security number.

6          In Ms. Apatang's case, there was no -- the

7     potential soldier didn't even know he was being nominated and

8     his -- pardon me, that she was being nominated and all her

9     identifiers had been used unlawfully.

10          THE COURT:  All right.  But wait, we got that.

11     But with regard to Mr. Babauta, you're saying that Mr. -- the

12     son consented to his information going to his dad.

13          MS. DAVID:  Correct.

14          THE COURT:  We got that.  Did the son consent to

15     his information going to Constantino?  Did he say,

16     Mr. Constantino, you have my consent?

17          MS. DAVID:  Later on he did.

18          THE COURT:  Yeah.  But not at the time.  When

19     they did the whole, if you will, conspiracy or meeting of the

20     minds, it was Mr. Babauta who told Constantino, Here's the

21     information to recruit my son.

22          MS. DAVID:  Let me clarify my statement earlier.

23     There is evidence to the effect that the son will claim that

24     he did provide such consent for use of his personal

25     information.

1           THE COURT:  To?

2           MS. DAVID:  To Mr. Constantino.

3           THE COURT:  Hm-hmm.  Previously, he had said that

4   he had never met with Constantino, then he said at the last

5   hearing that he did meet with the Constantino when in fact

6   he's never met with Constantino.

7           MS. DAVID:  And --

8           THE COURT:  Is that true?

9           MS. DAVID:  Yes.

10          THE COURT:  Correct me if I'm wrong.

11          MS. DAVID:  That's true, Your Honor.  I mean,

12  there's a later account made by William Babauta that he did

13  provide consent for use of his information.

14          THE COURT:  Hm-hmm.  But when did he provide

15  that?  As I recall, Ms. Rosetta San Nicolas' offer of proof

16  was that she had indicated at the time of the Constantino

17  diversion that -- and you heard the -- my court reporter read

18  back --

19          MS. DAVID:  Yes.

20          THE COURT:  -- the transcript, Constantino had

21  nothing -- he said he got the information from his

22  co-defendant Franklin Babauta.  Constantino said he then

23  inputted what defendant Franklin Babauta told him.  Right?

24          MS. DAVID:  That's correct, Your Honor.  But

25  since --

1          THE COURT:  So when was the consent, really?

2          MS. DAVID:  Since then, Your Honor, we received

3    information from the son that there was a meeting with

4    Mr. Constantino that he had provided consent to his father and

5    ultimately to Mr. Constantino for use of his personal

6    information.

7          THE COURT:  Yeah.  And when was that consent with

8    Constantino, after it had all been done, so that he could come

9    into court and claim, Hey, look, you know what, there's really

10   not a case on the aggravated identity theft issue?  Is that

11   the issue?

12         MS. DAVID:  That's what happened, Your Honor.

13         THE COURT:  Okay.  So then there was no consent

14   beforehand, like in the case of Charlene Apatang-Blas.  Isn't

15   that even more egregious?

16         MS. DAVID:  No, Your Honor.  I'm saying we

17   received clarification later on from the son, William Babauta,

18   that this is the evidence that we had to deal with, Your

19   Honor.  We received confirmation and clarification later on --

20         THE COURT:  Right.

21         MS. DAVID:  -- that William Babauta provided the

22   consent for use of such information.

23         THE COURT:  And to Constantino.  When did he

24   provide that, when did he say he provided that?

25         MS. DAVID:  Um --

```
 1              THE COURT:  The personal identifying information.
 2    I mean, does it really -- it would -- I would assume it would
 3    have to be after his name was already inputted?  Am I right or
 4    wrong on that?  Explain that to me.
 5              MS. DAVID:  Your Honor, this is --
 6              THE COURT:  You're talking about --
 7              MS. DAVID:  -- information that was provided to
 8    us later on.
 9              THE COURT:  Right.
10              MS. DAVID:  By the son.  He would have testified
11    that he had -- that he knew Mr. Constantino because his father
12    and Mr. Constantino were friends, he had met him on earlier
13    family occasions.  He trusted his father, the defendant, in
14    his father's use of his personal information.  That was later
15    clarified to us.  So this is information that the government
16    had to factor in, in preparation for trial.
17              THE COURT:  You didn't answer my question.  When
18    did -- when was it then that William Babauta, the son,
19    provided the personal identifying information to Constantino?
20    Before Mr. Babauta's father gave it to him or after?
21              MS. DAVID:  That would be around the same time,
22    Your Honor.
23              THE COURT:  So what was it?  Before or after?
24              MS. DAVID:  It would be around -- it would be --
25    it would be before.
```

1          THE COURT:  Before what?

2          MS. DAVID:  Um -- the son obviously gave consent

3    to his father's use of his information.

4          THE COURT:  Right.  You said that.

5          MS. DAVID:  And -- and the father then provided

6    that information to Constantino.

7          THE COURT:  Who then inputted it into the

8    computer.

9          MS. DAVID:  That's correct.

10         THE COURT:  According to your trial brief.

11         MS. DAVID:  Correct.

12         THE COURT:  And then he did the recruitment and

13   got the money.  So then we have this other factor.  Now, the

14   son, the nominee --

15         MS. DAVID:  Right.

16         THE COURT:  -- comes in and says, Okay, now I

17   want to say I gave the personal identifying information to

18   Constantino.  The question is:  Did he give it to him in

19   person?  Because that's really the issue, right, under G-RAP,

20   you have to give it in person when you do a recruit?  Did he

21   do it in person?

22         MS. DAVID:  And he would testify that he had

23   known the defendant through -- through --

24         THE COURT:  He knew which defendant, Constantino?

25         MS. DAVID:  Constantino.

1          THE COURT:  Okay.  Through his dad?

2          MS. DAVID:  Through his dad.

3          THE COURT:  All right.

4          MS. DAVID:  And they had met and discussed

5     benefits of joining the Guard.

6          THE COURT:  All right.  So then Constantino

7     recruited him properly, that's what your saying?

8          MS. DAVID:  That's certainly one of the factors

9     that we had to deal with.

10          THE COURT:  Okay.  So my question is again:  When

11     did he recruit him?  Before -- I mean, I'm sorry.  The

12     personal identifying information that's critical to aggravated

13     identity theft for Constantino.  When was that information

14     given to Constantino?  Not from the Mr. Babauta, but from his

15     son, the nominee.  When was that given to him?

16          MS. DAVID:  I think that was provided through the

17     father, Your Honor.  The factor we also focused on was whether

18     or not the nominee had met, for example, the recruiting

19     assistant.

20          THE COURT:  And the answer is?

21          MS. DAVID:  And the nominee witness in this case

22     would say that he did, he clarified that to us that he had met

23     and discussed the benefits of the Guard program.

24          THE COURT:  So Constantino properly recruited the

25     nominee?  Is that what you're saying?  That's what the

1  evidence will show?

2              MS. DAVID:  That would be the differing accounts,

3  Your Honor.  Whether or not the government wished to proceed

4  with Account A or Account B, became then a factor in weighing

5  our litigative risk in this case.

6              THE COURT:  So initially though -- I'm sorry,

7  just to be clear though, you had indicated that the son, the

8  nominee, William Babauta, did meet with Constantino to be

9  properly recruited?  That's what one account says?

10              MS. DAVID:  That's what one account says.

11              THE COURT:  And other account says, the son says,

12  Oh, that never happened, I never met with him?

13              MS. DAVID:  Correct, Your Honor.

14              THE COURT:  So you have a son that's giving two

15  different versions of what happened?

16              MS. DAVID:  That's correct.

17              THE COURT:  All right.  Okay.  So maybe the

18  aggravated identity theft is out?

19              MS. DAVID:  Correct, Your Honor.

20              THE COURT:  So what did Constantino steal then?

21              MS. DAVID:  Um --

22              THE COURT:  If he did it properly, let's assume

23  -- I mean, what did he steal?

24              MS. DAVID:  Um --

25              THE COURT:  Or convert, if you will?

1          MS. DAVID:  It would still be -- if the

2     government, through its plea negotiations with opposing party,

3     it would still be the fraud committed under the G-RAP program

4     whether or not we use Account A or Account B.

5          THE COURT:  Okay.  But if you just look at the

6     two defendants, Constantino and Babauta, you have the --

7     according to the offer of proof, Ms. San Nicolas said in

8     Constantino's diversion hearing, she said, William Babauta now

9     claims that he did provide his -- okay.  That William Babauta

10    provided his personal information to Constantino, which is

11    what was consistent.  And so I said, So William Babauta's

12    information exculpated Constantino?  And I asked her, Is

13    aggravated identity theft out?  And Ms. San Nicolas said,

14    Yeah, it's weaker but shakier.  Right, do you remember her

15    saying that?

16          MS. DAVID:  Yes.

17          THE COURT:  But then she said Constantino had

18    nothing -- Constantino said that -- I mean, Mr. Constantino

19    made a statement inculpating himself in his initial, if you

20    will, confession.  And that's where you said there were

21    initial confessions, right?

22          MS. DAVID:  Yes, Your Honor.  So the government

23    in its proposals and negotiations with opposing party had to

24    factor in all the differing accounts of what was presented to

25    us in this case.  But certainly, Your Honor, with respect to

1  the earlier case, Ms. Blas, that certainly was the traditional

2  G-RAP program violation where indeed there was, in fact, no

3  interaction between a potential nominee soldier and the

4  recruiting assistant.

5          THE COURT:  But doesn't it seem a little -- a

6  little more fishier, if you will, or little more suspicious

7  that you have a father/son/friend recruitment and then the

8  monies are not going out the way it traditionally should go

9  out?  Versus when you say traditional, you're saying, So

10  traditionally, in the case of Sergeant Blas here, because --

11  and you said the nominee was not known to Ms. Blas but later

12  on you find out, yes, he was known or the person was known,

13  but was not consenting.  I guess --

14          MS. DAVID:  She had no idea that -- that she had

15  been nominated under the program.

16          THE COURT:  Right.  I got that.  Right.  That

17  makes a difference to you?

18          MS. DAVID:  Correct, Your Honor.

19          THE COURT:  So the fact that the son here knew he

20  was being nominated, that's okay?  Even though he didn't

21  initially -- he initially said, I never met with Constantino

22  at all?

23          MS. DAVID:  Correct, Your Honor.  We had to deal

24  with different versions of accounts provided by individual

25  witnesses in this case.

1          THE COURT:  All right.  And so you feel this is

2    justified for this Court -- you're asking this Court to accept

3    a misdemeanor plea of conversion of property, which is

4    essentially -- which is essentially theft of government

5    property, but you're calling it conversion, it's under the

6    theft charge, right?

7          MS. DAVID:  That is correct, Your Honor.  I mean,

8    we understand the Court's concerns and certainly those were

9    concerns we had to deal with.  But at the end of the day, we

10   have had to look at our total case and weigh our litigative

11   risk.  Thank you, Your Honor.

12          THE COURT:  Thank you, Ms. David.

13          Mr. Lujan?

14          MR. LUJAN:  Yes, Your Honor.  Thank you.

15          Your Honor, I'll take a stab at this because I do

16   have an interest in the Court accepting the plea agreement.

17   And --

18          THE COURT:  Well, as you can see, my biggest

19   concern is, I think that there's a disparity --

20          MR. LUJAN:  Yes.

21          THE COURT:  -- in treatment, in terms of the

22   offer, and also a potential disparity in sentencing.

23          MR. LUJAN:  I understand.

24          THE COURT:  And so the Court is questioning

25   whether it should even accept this plea agreement.

1          MR. LUJAN:  Right, I understand.  And that's why,

2   you know, I, you know, appreciate the Court allowing me to,

3   you know, speak.

4          MS. DAVID:  Your Honor, may I just interrupt.

5   Your Honor had some concerns in terms of sentencing.  This is

6   not a plea agreement where it would be binding on the Court

7   with respect to a certain specific sentence recommendation.

8          THE COURT:  No, I understand that.  That's right.

9   This is not an 11(c) plea.  I understand that.

10         MS. DAVID:  So I just wanted to make that record.

11         THE COURT:  No.  I know that.  I saw that in the

12  plea agreement.  And I don't accept those anyway.  I don't

13  accept 11(c) pleas.  But I'm talking about disparity in

14  sentencing when you have somebody like Ms. Apatang-Blas who

15  was not given any deal like this and she faces a felony

16  conviction and has a higher sentence possibility versus this

17  defendant or any other defendant, possibly even Constantino,

18  who would get a misdemeanor and would face a lighter sentence.

19  That's what I'm talking about in disparity.  Okay?

20         MS. DAVID:  Understood.

21         THE COURT:  Okay.  Thank you.

22         MR. LUJAN:  Well, okay --

23         THE COURT:  Can we take a ten-minute recess

24  because I --

25         MR. LUJAN:  Of course.

1                THE COURT:  I'll let you speak in ten minutes.

2    Okay.

3                MR. LUJAN:  Yes, Your Honor.  Thank you.

4                THE CLERK:  All rise.  The Court's in recess.

5                (Recess taken at 11:23 a.m. until 11:41 a.m.)

6                THE COURT:  Back on the record.

7                *U.S.A. versus Franklin R. Babauta.*  All counsels

8    are present.  The defendant is present.

9                And so the good news is my jury commissioner was

10   able to get a hold of all the jurors, so they're on call.

11   They don't have to arrive here yet.  So that's a good news.

12               Ms. David, we won't waste the money then today as

13   of right now.

14               MS. DAVID:  Thank you, Your Honor.

15               THE COURT:  So no, I thank my jury commissioner.

16   I didn't know she was able to do that.  She told me last night

17   that it would be most impossible to do that.  But I will say

18   that in the future if we have a case set for trial, I'm gonna

19   advise all counsels that if the jurors are coming in and

20   there's no way to call them up and say they can't come in,

21   then that means that the defendant will have to plead straight

22   up or else we go to trial, or else make arrangements prior to

23   that ahead of time.  You guys should know whether somebody is

24   going to be pleading ahead of time.  Okay.

25               MS. DAVID:  Yes, Your Honor.

```
 1                    THE COURT:  That would be a lot more feasibly
 2       economically responsible.  Okay, Ms. David?
 3                    MS. DAVID:  Yes, Your Honor.
 4                    THE COURT:  Okay.  Thank you, I appreciate it.
 5       Remember, that's the second time I've had to tell you guys.
 6       But let's try it get this down right.  All right.
 7                    Mr. Lujan?
 8                    MR. LUJAN:  Yes, Your Honor.
 9                    THE COURT:  Yes, go ahead.  You wanted to
10       proceed.
11                    MR. LUJAN:  Thank you, Your Honor.
12                    THE COURT:  You still want to proceed with this
13       plea agreement?
14                    MR. LUJAN:  Oh, yes, Your Honor, of course.
15                    THE COURT:  Go ahead.
16                    MR. LUJAN:  Yes.  You know, I believe that, you
17       know, if I have a moment --
18                    THE COURT:  Yes.  Testing, can you hear us?
19                    MR. LUJAN:  Oh --
20                    THE COURT:  A lot better?
21                    MR. LUJAN:  No, it's really good, Your Honor.
22                    THE COURT:  Yeah.
23                    MR. LUJAN:  The evidence -- you know, I believe
24       that, you know, this is just to put things in perspective,
25       that the evidence will show -- had this trial gone on -- and
```

```
 1   the evidence will show that, you know -- you know, Your Honor
 2   is right, Mr. Babauta has been, you know, in the Army and the
 3   Army National Guard for at least 25 years, by the time he
 4   retired.
 5             THE COURT:  He's already retired?
 6             MR. LUJAN:  Yes, Your Honor.  He retired in June
 7   of last year.
 8             THE COURT:  All right.
 9             MR. LUJAN:  And so, you know, and while, you
10   know, he's been in there that long, he never heard of the
11   G-RAP program, you know.  And so in late 2009 or very early
12   2010, but definitely before January 26th, 2010, because that's
13   the date that Constantino entered William's personal
14   identification information in the computer, he was down at the
15   recruiting office, meaning Mr. Babauta, with his son.  And,
16   you know, he was talking to Sergeant Gonzalo or Gonzales,
17   Fernando or Fernandez.  And so he was saying, you know, he
18   wants, you know -- he wants his son to enter the military
19   because, you know, there's a lot of benefits.  And of course,
20   you know, as being a lieutenant colonel and having spent all
21   these years, you know, he knows the good things.  So --
22             THE COURT:  I think everybody knows that.
23             MR. LUJAN:  That's right.  And so --
24             THE COURT:  It's advantageous for many young men
25   and women.
```

1          MR. LUJAN:  Well, Your Honor, you'll be

2     surprised, I was in the Army and they didn't pay back then in

3     1965, they paid us $53 a month.  Believe me, that was it.  So

4     -- but any how --

5          THE COURT:  You turned out really good, look at

6     you.

7          MR. LUJAN:  Your Honor --

8          THE COURT:  So successful.

9          MR. LUJAN:  Your Honor, by the time I -- you

10    know, you go up there and get your money from the -- you know,

11    they give you the cash and you get the money from the sergeant

12    and -- you know, on the table.  And by the time you walk out,

13    there's a line of people, you start paying everyone, all of

14    them, and before you get to the end of the line, you start

15    borrowing money.  So believe me, believe me, (laughing) it

16    wasn't nice, Your Honor.

17         THE COURT:  Well --

18         MR. LUJAN:  But any how.  So, you know, Sergeant

19    Fernandez suggested to him, Why don't you G-RAP your son?  So

20    he asked him, What is G-RAP?  He said if you -- you know,

21    there's a program where, you know, you could become a

22    recruiter.  And if you G-RAP, you could get, you know, get the

23    bonus.  So he goes and, you know, he was told, you know, about

24    this.  So he goes in, you know, to his computer, tries to --

25    and you know, tries to -- to enter this program.  And you

1    know, this Docupack program.

2              THE COURT:  So you know what, I'm curious though,

3    SFC Sergeant First Class Fernandez, right, he himself was a

4    recruiter?

5              MR. LUJAN:  Yes, Your Honor, a regular recruiter.

6              THE COURT:  A regular recruiter.  Not a G-RAP

7    recruiter?

8              MR. LUJAN:  No, he's not a G-RAP, he's a regular

9    recruiter, he's a full-time recruiter.

10             THE COURT:  So this is a different program?

11             MR. LUJAN:  Yes.

12             THE COURT:  All right.  So he's --

13             MR. LUJAN:  And so, you know, the purpose of

14    G-RAP is really -- you know, it's -- it's -- it's designed

15    really for Army people and, you know -- but there are certain

16    people in the -- on, you know, the U.S. Army that are

17    prohibited from becoming RA simply by virtue of their, for

18    example, being a full-time recruiter, you know.  And you know

19    -- so he tries to get in that program.  And, you know, with --

20    you know, he immediately finds out he was blocked because he

21    is ineligible because he's a full-time rather -- you know,

22    active duty officer.

23             THE COURT:  Okay.

24             MR. LUJAN:  Okay.  And Your Honor has seen the

25    exhibits here.  There's a module, once you -- you're allowed

1    to get, you know, into that program, Your Honor, you know,

2    there's -- I believe the government and myself, you know, we

3    mark the G-RAP modules or Docupack modules as an exhibit, and

4    it's pretty lengthy.  It's 15 sections of the dos and don'ts.

5    So Mr. -- you know Mr. Babauta was never able to access that.

6    So he goes back to Gonzales and told Gonzales that, you know,

7    I tried to but, you know, I can't get in, I'm blocked.  And

8    then Gonzales told him, Oh -- I'm sorry, when I say Gonzales,

9    I mean Gonzales or Fernandez.  Okay?

10                 THE COURT:  Okay.

11                 MR. LUJAN:  It's his first name and last name.

12   But so, you know, he told him that, Look, that's probably

13   because you're active duty, but why don't you find an RA, you

14   know, someone who can -- you know, who can recruit your son.

15   And so -- okay, so one day, he runs into Constantino right

16   there, again, I believe in the recruiting office or at his

17   office.  So he was talking to Constantino and William was with

18   Mr. Babauta.  And he mentions to Constantino that he would

19   like, you know -- he heard that there's a bonus and would

20   like, you know, to recruit his son but he can't do it and, you

21   know, he was hoping that he could do it because of that 2,000.

22   So Constantino said, Oh, I'm an RA, I can do it.  All right.

23   So then, you know, William and Constantino were talking also

24   at the same time.  So, you know --

25                 THE COURT:  He told William, the son?

         1              MR. LUJAN:  Yes, the son.

         2              THE COURT:  Okay.

         3              MR. LUJAN:  And so he said, Oh, great, I

         4    appreciate that.  So Constantino then, you know -- you know,

         5    entered -- you know, then did, I guess, what he's supposed to

         6    do.  All right.  So then --

         7              THE COURT:  So you're saying Constantino was

         8    lawfully recruiting Mr. Babauta's son?

         9              MR. LUJAN:  I believe so, Your Honor.  I believe

        10    so.  And so -- because, you know, that's what William, I

        11    believe, will say.

        12              And we'll get to William and why we change our

        13    plea, Your Honor.  Okay.

        14              So after that, you know, he didn't --

        15              THE COURT:  So if Constantino was lawfully

        16    recruiting -- if Constantino was lawfully recruiting the

        17    nominee son, William Babauta, then he's not -- according to

        18    your theory, then he's not -- shouldn't be charged with

        19    aggravated identity theft nor should he be charged with theft.

        20              MR. LUJAN:  I believe no one should be charged

        21    with aggravated theft, Your Honor, but unfortunately we're

        22    here.  Okay.  And you know -- and going to trial presents its

        23    risk.  But you know, I simply wanted to tell the Court what

        24    the evidence is going to show, briefly.

        25              And so, you know, Mr. Babauta -- then one day,

1    after his son's in the Army, one day Constantino runs into him

2    and says, Oh, I received the check, I received the 2,000.

3    Okay. And so you know -- then you know, Constantino said, Why

4    don't you come by my office. So Mr. Babauta goes to

5    Constantino's office and Constantino said, Look, you know, I

6    received the 2,000, what I'll do is I'm going to -- you know,

7    I'm going to give you a check for 1,800 and I'm going keep 200

8    for my taxes. That's what the evidence will say. All right?

9    So, you know, of course, Mr. Constantino does that. He gives

10    a check to Mr. Babauta for 1,800. That's what this -- the

11    evidence will say. Mr. Babauta then, you know, of course,

12    cashes the check and keeps it, you know, at home, you know,

13    the cash, and uses it, you know, gives some to his son, you

14    know, and some he uses for dinner, you know, taking his family

15    out. And by the time -- you know, by the time he was -- I'm

16    sorry.

17          THE COURT: Let me just ask you this though:

18    Isn't it true though under the G-RAP program, the son should

19    not receive any part of that $2,000?

20          MR. LUJAN: It is true that the RA is not

21    supposed to share with the nominee. That's true. He's not a

22    nominee, Your Honor. That's the position I've been arguing,

23    you know. This is my third time now arguing that. I argued

24    it. And the motion to dismiss. And I argued it, I guess,

25    last week in the -- you know, the diversion -- pretrial

1    diversion.  So he gets the 1,800, okay, and that's the end of

2    this.

3              Now, later on, of course, you know, now -- then

4    he gets interviewed and he gets charged.  The distinction

5    between Blas and Mr. Babauta is this --

6              THE COURT:  Ms. Blas?

7              MR. LUJAN:  Yes, Ms. Blas.

8              THE COURT:  Sergeant Blas, if you will.

9              MR. LUJAN:  Okay, sergeant.  All right.  The

10   distinction -- the difference is, first of all, he's not an

11   RA.

12             THE COURT:  She's not an RA.

13             MR. LUJAN:  No, Mr. Babauta is not an RA.

14             THE COURT:  Right.  So that's what the prosecutor

15   said.

16             MR. LUJAN:  Right.  Secondly, there's 15 parts of

17   this program, this Docupack program.  And you know -- and it

18   tells the RA, you know, for each step along the way that the

19   RA -- you know, anyone desiring to become an RA must traverse

20   that program.  And then, you know, for each section, you know,

21   there's questions and -- you know, questions asked and there's

22   a block for answers.  And then, you know, it tells -- you

23   know, then it says, Congratulations, you passed this.  And so

24   then you move on to the next section.  And I guess ultimately,

25   you know, when you finish that, you know, Voilà, you're an RA.

1   And you have an account and all those things.

2             So, you know, because it was blocked, he never

3   got to know what the dos and don'ts are.  Meaning Babauta, he

4   never got to know what the dos and don'ts are.

5             However, the evidence is gonna show that an RA is

6   entitled to $1,000, you know, when an RA recruits a nominee.

7   Now, that's the -- it's a performance-based, you know,

8   program.  It's not a bonus, it's the RA must earn this in his

9   -- during his off -- during his off Army hours and he cannot

10  use government -- rather government equipment, computer, car.

11  He can't wear his uniform, he can't wear his hat, he can't

12  recruit on base.  He must go out in the community.

13            THE COURT:  All right.  So was Constantino

14  following those rules?

15            MR. LUJAN:  I believe so, Your Honor, because I

16  believe he did try to recruit five or six other people.

17            THE COURT:  But when it came to the son --

18            MR. LUJAN:  William.  It's different, because

19  William, you know, is the son of an active duty person.  Or

20  you know, Mr. Babauta was active duty, you know, during that

21  period.  And you know, but -- and William is constantly there

22  since he was a teenager, always going, you know, to Barrigada

23  and I believe to Agana, you know, where recruiting office is.

24            THE COURT:  I know.  But my question is, and

25  maybe Ms. David can confirm this.  So with regard to

1 Constantino, did he follow the rules and not wear his uniform

2 when he did the recruitment?

3          MR. LUJAN:  Well, I don't know about that, Your

4 Honor.  That's, you know --

5          MS. DAVID:  That would be a violation under the

6 program, Your Honor.

7          THE COURT:  Right.  Did he follow -- did he

8 violate the program rules or did he follow them with regard to

9 his uniform and the other rules?

10          MS. DAVID:  He did not.

11          THE COURT:  He did not follow the rules?

12          MS. DAVID:  That is correct.  He did not.

13          MR. LUJAN:  Well, Your Honor -- what --

14          THE COURT:  Wait.  You brought this up so I'm

15 asking.  So what about Ms. Blas, did she follow the rules and

16 was she in her uniform?

17          MS. DAVID:  The evidence with Ms. Blas's case is

18 she didn't follow the rules because there was no interaction

19 at all with the nominee.

20          THE COURT:  I'm talking -- I know that part.  I'm

21 asking about the uniform.  You're saying that Babauta --

22 sorry, not Babauta -- Constantino was in uniform when he

23 recruited?

24          MS. DAVID:  No, I -- there's no evidence to show

25 that Ms. Blas was in uniform during her recruitment efforts.

1                THE COURT:  Okay, so Constantino was in uniform

2     when he recruited but Ms. Blas was not.  So she followed the

3     rules, at least that rule?

4                MS. DAVID:  Yes, Your Honor.

5                THE COURT:  Okay.  All right.

6                MR. LUJAN:  Now, okay, may I continue?

7                THE COURT:  Yeah.

8                MR. LUJAN:  Okay.  Now, in regards -- so

9     Mr. Babauta, because he never went through the Docupack

10    program, you know, never saw the dos ans don'ts.  He was never

11    advised by the recruiter -- what's his name?  Gonzales

12    Fernandez, SFC Fernandez, you know, about the dos and don'ts.

13    That's one.  He was never informed by anyone, you know, that,

14    you know, that he can't be the one to give him -- you know, to

15    give the recruiter, the RA, you know, the personal

16    identification information of his son.  So he had absolutely

17    no knowledge of this.

18                Now, the evidence will also show, Your Honor,

19    that Mr. Constantino can share the money with anyone he wants

20    except with three or four classes of people.  One, he can't

21    share money with a nominee.  Two, he can't share money with a

22    full-time recruiter.  And three, he can't share money with --

23    you know, there's two other classes that -- of the military

24    people that he cannot share with.  So that's the third and

25    fourth.  The evidence will show --

1              THE COURT:  I'm sorry, who was the third class?

2              MR. LUJAN:  Your Honor, I keep forgetting but

3    these are all military people.

4              THE COURT:  But not relevant to this case?

5              MR. LUJAN:  Right, not relevant to this case.

6    And the evidence will show that Mr. Babauta does not fit into

7    any of those people -- classes of prohibited people than, you

8    know, an RA --

9              THE COURT:  Okay.  So you're saying essentially

10   Constantino can give away the money to whoever he wants to

11   give to?

12             MR. LUJAN:  Your Honor, that's right.

13             THE COURT:  Other than nominee or full-time

14   recruiter?

15             MR. LUJAN:  That's right.  And I said that last

16   time.

17             THE COURT:  So Mr. Babauta received the money

18   legally, that's what you're saying?

19             MR. LUJAN:  That's right, Your Honor.  And

20   Babauta -- and Constantino kept the 200 for taxes.

21             THE COURT:  Right.  Okay.

22             MR. LUJAN:  For taxes.

23             THE COURT:  All right.

24             MR. LUJAN:  And so, you know -- so as far as

25   Mr. Babauta is concerned, you know -- I mean, he didn't know

1    what is -- you know, what is prohibited and what's allowed,

2    simply.  And, you know, he was given, you know the -- you

3    know, the impression that he can go and find someone.  You

4    know, by recruiters, he could find an RA, and that RA can

5    recruit his son and, you know -- and therefore, he'll be able

6    to get some money for his son's college and spending,

7    whatever.  So that is, you know, the distinction, Your Honor,

8    between my client and, you know, Ms. Blas.  So I just wanted

9    for the Court to, you know, know what the facts will show.

10            Now, let me tell you why we didn't notify the

11   Court of the plea agreement until three or 3:15 yesterday.

12   Because as of 2 o'clock, Your Honor, I was prepared to go to

13   trial.  We were going to trial.  At 2 o'clock I met with my

14   client and I was at my house fixing everything, you know,

15   getting ready to go to trial.  And I came down at 2 o'clock,

16   had an appointment, and I received a new discovery.  And it's

17   another interview of William that occurred on December 2,

18   2015.  And so, of course, it's a third version or fourth

19   version, okay?

20            And I know that William, of course is -- you

21   know, the key -- you know, he's a key witness.  And while I

22   feel that I could -- you know, I can win this case, I can --

23   that the government won't be able to convince a jury -- you

24   know, I was of the impression that if William can't withstand

25   the pressure of being interviewed by two people, one person or

1 two persons, law enforcement, in a private setting, how is

2 William going to withstand being cross-examined, you know, in

3 open court, in your presence, Your Honor. In the presence of

4 everyone.

5 And so, you know, it's one of the factors, Your

6 Honor, that at that point, you know, once my client became

7 aware of that, we discussed that. And so in order to spare

8 his son the trauma of that, that's why we agreed to this deal.

9 So that's the other distinction, Your Honor. It's because

10 it's a father rising, you know, standing up to protect his

11 son. The mother was present and, of course, no one wants, you

12 know, to put that on the boy. That's why, Your Honor. So

13 that's why it was not until -- after that I immediately called

14 Marivic, or Ms. David, and I told her, We're going to take the

15 deal. And that's when I called Marilyn and told her.

16 So that's why, Your Honor, it was that last

17 minute, because I didn't see that until yesterday when -- you

18 know, after two, when I received that. Enough time to discuss

19 that with my clients, with my client, rather, and the

20 potential consequences. So that's why.

21 So I'm asking that the Court, Your Honor -- that

22 the Court, you know, see the distinction between Ms. Blas and

23 Mr. Babauta. And you know, I believe the evidence is

24 different. And so I believe it's a recognition, Your Honor,

25 by both, not just the government. The government was candid

1  about -- you know, about how a jury may -- may see the

2  evidence.  But I'm also being candid with Your Honor that, you

3  know, I do have a problem.  While I feel confident, I have a

4  problem with, you know, with a potential -- with a witness.

5  And you know -- and of course, my client and his wife wanted

6  to spare that -- you know, William, the trauma of being

7  cross-examined.

8              THE COURT:  The Court can appreciate your

9  concern.

10             MR. LUJAN:  Yes.

11             THE COURT:  What do you think about -- since

12  you're on a roll here, Mr. Lujan, how do you compare the

13  culpability of Mr. Constantino and Mr. Babauta?

14             MR. LUJAN:  Your Honor --

15             THE COURT:  I heard all that you said about.

16  Mr. Babauta.  So assuming that you're right...

17             MR. LUJAN:  You know, Your Honor, you know I'm a

18  trial lawyer, and you know --

19             THE COURT:  You don't have to answer it, I'm just

20  asking.  If you wish to answer it, you can.

21             MR. LUJAN:  So I prefer not to answer, Your

22  Honor.

23             THE COURT:  Okay.

24             MR. LUJAN:  Yes.

25             THE COURT:  All right.

1          MR. LUJAN:  Okay?  All right.  So I -- you know,

2     I guess, I'm asking that the Court accept the plea agreement.

3          THE COURT:  Well, let me just say, Mr. Lujan,

4     again, I'm having concerns about it, really.  Because I

5     understand now that it's been flushed out here in open court

6     about the mitigating factors that you believe are here on

7     behalf of Mr. Babauta and the reason why you've wanted to

8     enter this plea, the Court appreciates that.  But my concern

9     really is this issue between -- now, between Constantino and

10    Blas.  Because the whole issue is Constantino is a recruiter.

11    So if he's a recruiter he should know all the information

12    about personal identifying information, he should know it just

13    as well as Ms. Apatang-Blas.  They both should.  And

14    Mr. Constantino is being offered a diversion, even a better

15    deal than your client.

16         MR. LUJAN:  Well, Your Honor, we were offered it,

17    you rejected it.

18         THE COURT:  I rejected it but I haven't heard all

19    this information.  I mean, this is now -- this information is

20    different.  I mean, you've added more things that I didn't

21    know.  Each time I hear from you all, first I hear from the

22    prosecutor in the Constantino case and I hear from Ms. David

23    in Mr. Babauta's case, and then I'm hearing from Ms. David and

24    you here in Mr. Babauta's case again, and I, of course, heard

25    from Mr. Gorman previously on the Apatang-Blas case.

1          So I mean, we're looking at the G-RAP case.  This

2    is a very serious issue here in the court.  And not just here

3    in this island, it's in the nation.  But clearly, for this

4    island.  But just in terms of fairness, I want to address

5    this.  That's why I brought this forward to all of you, and

6    have indicated that I -- I'm looking quite seriously about

7    whether or not the Court should accept this.  And I guess part

8    of it it's going to be how the Constantino matter is going to

9    be dealt with.  I need to know, every time I have a sentencing

10   of co-defendants, and Ms. David knows this and Mr. Lujan, you

11   know this, is I look at culpability of each defendant.

12          MR. LUJAN:  Of course.

13          THE COURT:  Within the case itself and then also

14   in terms of potential sentencing of -- like, we have

15   Apatang-Blas, and then now we have potentially Mr. Babauta or

16   Mr. Constantino.  How does the Court evaluate that in terms of

17   disparity in sentencing?  Which I have -- I can consider that

18   under the law.  And also, just in terms of fundamentally

19   fairness with regard to what's being offered, diversion in a

20   felony case, misdemeanor, plea agreement in this case, and a

21   felony plea agreement in another case, which essentially have

22   very similar, if not almost identical, situations.  I'm not

23   saying that -- Babauta is a little different.  Mr. Babauta is

24   a little different in terms of the fact that he's not a

25   recruiting assistant.

1           MR. LUJAN:  And you know, Your Honor, I must

2     apologize that I was not articulate enough last week on the

3     pretrial diversion.  But I seem to -- if -- if I'm hearing

4     correctly, and interpreting what I think I'm hearing from you

5     --

6           THE COURT:  Don't assume you're hearing anything

7     from me.  But go ahead, what do you think?

8           MR. LUJAN:  That, you know, had you heard this

9     information last week about what I just said, that it may

10    have, you know, impacted your thoughts differently on whether

11    or not to take the pretrial diversion.  And if I'm, you know,

12    correct in that, I guess, assumption, then I would -- my

13    client would have no objection to, you know -- you know,

14    asking the government to reinstate the pretrial diversion plea

15    agreement.  I'd rather -- not agreement, agreement.

16          THE COURT:  It's a different --

17          MR. LUJAN:  Yes.

18          THE COURT:  There's a difference.  Don't assume

19    that either way.  Don't assume that I would have done

20    something one way or the other because I don't -- I don't know

21    what I would have done.

22          I'm just going to tell you this, that I think the

23    fact that -- and Ms. David has been very upfront, that she and

24    the U.S. Attorney, Ms. Limtiaco, are looking at diversion

25    agreements for the first time in felony cases.  And the Court

has looked at diversion.  And I looked back and I spoke with

Rossanna Villagomez-Aguon on all the diversion agreements in

the misdemeanor cases and I wanted to see what the treatment

was like, you know.  And you know -- because -- I mean,

misdemeanor cases -- obviously somebody would prefer --

everybody would prefer diversion as opposed to a guilty plea

to a misdemeanor or a felony.  Everybody would prefer a

misdemeanor as opposed to a felony plea.

I mean, you know, we know all the different

gradation of severity, but this is the first time that they're

entering into and they're still trying to establish, as I

understand it, their policy, their philosophy, their internal

agreement as to what should be brought before the Court in

terms of post-charge diversions.

So this just got caught in the middle of it.  I

mean, Constantino's case got up front and Constantino came up

before the Court, and then as I questioned it further then I

had Apatang-Blas by coincidence.  She came in and had to be

sentenced in between.  And so, you know -- and then now we

have Mr. Babauta.  So everybody is now caught in the middle of

how do we handle this fairly for everybody.  So that's what

I'm facing right now.

MR. LUJAN:  May I suggest, you know, then to Your

Honor, that perhaps we should all step back and, you know, put

this on hold and give the U.S. Attorney's Office, you know,

1  enough time so that they can come up with their guidelines,

2  you know, whatever -- you know, whatever is required in order,

3  you know, that pretrial diversion in felony cases, you know,

4  let's say can satisfy the Court.

5              THE COURT:  Well, let me just say, it's --

6              MR. LUJAN:  I mean, we have a lot of good people,

7  Your Honor, that are being really felonized, you know, by a

8  program that -- really, in which -- in which -- in which,

9  really... I mean, the contractor who made millions and

10  millions, scores of millions, none of them got ever, you know

11  -- all they care for is to get, I believe, $345 for each, you

12  know, recruitment.  I believe that that's -- they made some,

13  like, three or five hundred million, something like that.

14  Now, you know, I'm -- I'm not trying to go wild, you know, on

15  Your Honor, but I believe that's in the hundreds of millions,

16  Your Honor.

17              THE COURT:  All right.  Yeah, I don't know the

18  amount but I have read up on it.  All right.  Thank you.

19              MR. LUJAN:  Thank you, Your Honor.

20              THE COURT:  Ms. David, you want to say anything

21  further?

22              I know that we have the -- Ms. David, I know that

23  I have Constantino set for a hearing on Friday at 10:30 a.m.,

24  and I'm not sure, he should be back on Guam by then with his

25  counsel?  I know that the Court has set notice of that.

1     Do you have one -- Constantino -- I think.

2     PROBATION OFFICER:  No, Your Honor, I don't have

3 his file with me.  I'm not familiar with his travel plans.

4     (Pause.)

5     THE COURT:  Yeah, right, Carm?  I'm sorry, let me

6 just double check with...

7     (Discussion with law clerk.)

8     THE COURT:  Do you know the status of

9 Constantino?  Are you doing the Constantino case or --

10     MS. DAVID:  No, my colleague is.

11     THE COURT:  I'd like to have both of you there at

12 the hearing by the way.  I think that would be very important.

13     MS. DAVID:  That was my intention anyway, Your

14 Honor.  With respect to this case, Your Honor, I think both

15 Counsel and I tried to explain the mitigating factors involved

16 with respect to this defendant.  And the different versions of

17 accounts provided by government witnesses, or one witness in

18 particular.  And basically informing the Court for purposes of

19 each side's assessment of its litigative risk, we therefore

20 negotiated this plea that's presently before the Court to

21 consider.

22     On behalf of the government, I just simply

23 respectfully request that the Court go forward with the plea

24 agreement that the parties have already reached in this case.

25     THE COURT:  He just asked me to continue it.

1          MS. DAVID:  And I'm --

2          THE COURT:  You object to that?

3          MS. DAVID:  I'm objecting to that, Your Honor.

4          THE COURT:  All right.  I think, though, for my

5    purposes in terms of evaluating the case, I would prefer to

6    hold off at least until Friday until we have Mr. Constantino

7    in here with his counsel and with you or Ms. San Nicolas to

8    ascertain the different culpabilities here.  I mean, I heard

9    everything about Mr. Babauta.  And let's assume I believe

10   that's all true, then what about -- what's really the story

11   behind Constantino?

12          But I understand the litigative risk.  But I also

13   am more concerned too, because there's reasons why you would

14   proceed to dismiss the other charges, because -- or dismiss

15   all the charges.

16          You're dismissing all the charges?

17          MS. DAVID:  Yes, Your Honor.

18          THE COURT:  And there's the grand jury

19   indictment.  And proceeding with an information at least to

20   Mr. Babauta's case.  But I take that into consideration when I

21   also -- when I also think about Ms. Apatang-Blas.  Because

22   what I do today will set the course for other potential plea

23   agreements, moving 'em down to misdemeanor, if that's what the

24   prosecutor wishes to do in some instances and even diversions,

25   because now you have a diversion offer out to Constantino and

```
1   you've indicated to me today that you believe that
2   Mr. Constantino's actually more culpable than Mr. Babauta.
3   And if that's the case, then honestly, it may be that
4   Mr. Constantino doesn't deserve a diversion.  And I've had --
5   you know, I told you that, Ms. David, that the Court has some
6   thought that the Mr. Constantino should not get a diversion
7   agreement, based on everything that's unraveled so far.  But I
8   mean, I think it's going to depend on Friday how we proceed.
9               MS. DAVID:  All right.  Will the Court find an
10  ends-of-justice continuance today for purposes of this case?
11              THE COURT:  Yeah, I think, though, because
12  there's a proposed plea agreement under 18 U.S.C. 3161 that --
13  let me look at -- I don't think I need to find ends of
14  justice.  I think there's a consideration of the plea.  Let me
15  make sure I got this right.  Here we go.
16              To toll the speedy trial clock, that's what
17  you're asking, Ms. David?
18              MS. DAVID:  Yes, Your Honor.
19              THE COURT:  Okay.  Yeah.  Let me just get the
20  right statute.  Would you agree with the Court's position,
21  Mr. Lujan?
22              MR. LUJAN:  Yes, Your Honor.
23              THE COURT:  You're going be here this Friday?
24              MR. LUJAN:  Yes, Your Honor.  What time is
25  Mr. Constantino's case?
```

1          THE COURT:  Well, it's supposed to be at 10:30,

2     but let me verify that.  Are you at that trial with Judge

3     Sukola?

4          MR. LUJAN:  No, I think on the -- I'm good until

5     the 20th.

6          THE COURT:  Okay.  18 U.S.C. 3161(h)(g) --

7     (h)(1)(g), I'm sorry, (h)(1)(g); Delay resulting from

8     consideration by the Court of a proposed plea agreement to be

9     entered into by the defendant and the attorney for the

10    government.  Any period of delay resulting from proceedings

11    concerning the defendant, including but not limited to a

12    delay, that delay.

13         So I'm still considering the proposed plea

14    agreement.  And I think it would be very helpful, Ms. David,

15    if you and Ms. San Nicolas, I see she's here now, that you

16    explain to me why diversion should be given in Constantino or

17    why it should not be.

18         I mean, on my own I'm not even sure if that it --

19    that it should be based on the information that I've been

20    receiving from you and -- well, from you, actually, and even

21    Mr. Lujan.

22         MS. DAVID:  And it could very well be, Your

23    Honor, taking into account the Court's concerns and indeed the

24    overall facts involved in this case as to both defendants.

25    That's certainly something up for serious consideration.

1          THE COURT:  Also, too, Ms. David, I would ask you

2   to -- in terms of comparison on Ms. Apatang-Blas's case, since

3   you're the one that brought it up that she was a recruiter and

4   Mr. Lujan said, you know -- he's saying, Well, you know what,

5   my client is not a recruiter and he didn't have the training

6   like the recruiters did on the G-RAP stuff.  And we have

7   Apatang-Blas and Constantino that did.

8          How the Court should view both of them in terms

9   of disparity in treatment?  I'm concerned about that.

10          MS. DAVID:  We will certainly factor your

11   concerns, Your Honor, and it was my intention to also attend

12   the Friday hearing as well.

13          THE COURT:  Thank you, I appreciate that.  So I

14   will see you, and your client, Mr. Lujan, on Friday at 10:30.

15          MR. LUJAN:  Yes, Your Honor.

16          THE COURT:  Now, this is January 8th at 10:30.

17   And then we will reconfirm that Mr. Constantino will be here.

18   As I understand it, he's coming in that day and I would assume

19   that Mr. Fisher would have asked for a continuance and I have

20   not received any continuance.

21          MR. LUJAN:  Okay, Your Honor, we'll be here.

22          THE COURT:  So with regard to the proposed plea

23   agreement, the Court will not accept it at this time.  And it

24   will be on hold until -- the consideration of this will be on

25   hold at least until Friday, this Friday, at 10:30 a.m.  Okay,

1    Counsels?

2              MR. LUJAN:  Yes, Your Honor.

3              THE COURT:  All right.  Thank you, everyone.

4    I'll see you then.

5              MR. LUJAN:  Your Honor, am I correct that the

6    Court observes island day wear on Friday?

7              THE COURT:  I do.

8              MR. LUJAN:  Oh, good.  Thank you, Your Honor.

9              THE COURT:  Now, don't get too casual there,

10   Mr. Lujan.

11             MR. LUJAN:  Oh, no, Your Honor, I just want to

12   wear --

13             THE COURT:  It's called island wear formal,

14   whatever that means.

15             MR. LUJAN:  Right.  Well, it's what I wear.

16             THE COURT:  I know.  You dress quite nice,

17   Mr. Lujan.  All right.  Take care.  Thank you, Counsels.

18             MS. DAVID:  Thank you, Your Honor.

19             THE COURT:  I'll see you then.

20             (Proceedings concluded at 12:20 p.m.)

21                              *  *  *

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA       )
                      )  ss.
TERRITORY OF GUAM     )

         I, Veronica F. Reilly, Official Court Reporter for
the United States District Court of Guam, do hereby certify
the foregoing pages, 1 to 73, to be a true and correct
transcript of the proceedings held in the above-entitled
matter.
         Dated this 20th day of January, 2016.

                              /s/Veronica F. Reilly
                              Veronica F. Reilly